UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

GENEVA A. DANIELS,

                  Plaintiff,               10 Civ. 6510

   -against-                      OPINION

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                  Defendant.

------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        OLINSKY & SHURTLIFF
        300 S. State St., Ste. 520
        Syracuse, NY  13202
        By:  Howard D. Olinsky, Esq.

        Attorneys for Defendant

        PREET BHARARA
        U.S. Attorney's Office
        Southern District of New York
        One St. Andrew's Plaza
        New York, NY  10007
        By:  Susan D. Baird, Esq.

USDC SD
DOCUMENT
ELECTRO
DOC #:
DATE F:  4\18\12

**Sweet, D.J.**

Plaintiff Geneva A. Daniels ("Daniels" or the "Plaintiff") has moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings to review and reverse the decision of the Defendant Michael J. Astrue, the Commissioner of Social Security (the "Commissioner" or the "Defendant") denying Daniels disability benefits.  The Commissioner has cross-moved for judgment on the pleadings dismissing Daniels' complaint.  As set forth below, the motion of Daniels is denied, the cross-motion of the Commissioner is granted and his decision is affirmed.

**Prior Proceedings**

Daniels filed an application with the Social Security Administration ("SSA") for disability benefits on November 26, 2007 (Tr. 63-66).[1]  Her application was denied on January 17, 2008 and she requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 25-32).  The hearing was held on July 21, 2009 before ALJ Mark Solomon (Tr. 612-32).  On August 17, 2009,

---

[1]     References in the form "Tr." are to the transcript of the administrative record filed by the Commissioner as part of his answer.

the ALJ reviewed the case de novo and found that Daniels was not disabled under the Act (Tr. 7-18).  The ALJ's decision became the final decision of the Commissioner on June 25, 2010, when the Appeals Council denied Daniels' request for review (Tr. 2-6).

Daniels filed her complaint on September 10, 2010 seeking removal and reversal of the denial of review.  The instant motions were heard on September 21, 2011.

**The Facts**

Daniels was born on March 1, 1963 and was between 44 and 46 years old during the period at issue (Tr. 63-66, 612-32).  The period at issue is from November 26, 2007, the date Plaintiff filed an application for SSI benefits, through August 17, 2009, the date of the ALJ's decision.  She reported that she had completed the eleventh grade in school, and last worked as a parking lot cashier from 2005 to 2007 (Tr. 72, 616-17).  She previously worked as a store cashier from November 2001 to October 2002 and as a hair stylist in 1998 (Tr. 71-72, 616-617, 626).

2

At the hearing, Daniels testified that she had been hit by a car in May 2007, and injured her back, shoulder and neck (Tr. 616, 618). She reported pain in her left shoulder and stated that she could not reach with her left hand, but is right-handed (Tr. 623). She stated that she could not stand for more than twenty minutes, could not sit for more than twenty minutes, and could only walk one and one-half blocks before needing to rest (Tr. 622-23). She stated that she had to lie down for half an hour, up to two or three times per day, and also took medication that made her groggy (Tr. 621, 624).

Daniels also testified that she lived by herself but that her son visited daily and helped her clean (Tr. 620). Her niece also visited, and sometimes helped her get into the bathroom (Id.). She no longer socialized, with the exception of visits from her son and niece (Tr. 620-21). She testified that she sometimes walked one and one-half blocks to a grocery store with her son and sometimes took public transportation by herself depending on how she was feeling (Tr. 619, 622). Daniels stated that she could dress herself, but could not bend to tie her shoes (Tr. 620). She said she watched television, and sometimes read books or a newspaper (Tr. 621).

3

Vocational expert Raymond Cestar ("Cestar") also testified at the hearing (Tr. 624-32, 122-23). Cestar was present throughout the hearing and reviewed the exhibits (Tr. 625). He classified Daniels' prior work as a cashier as unskilled work requiring light exertion (Tr. 625-26). He stated that Daniels' other past work as a hair stylist was skilled work requiring light exertion (Tr. 626-27).

The ALJ asked Cestar about a hypothetical individual with the following characteristics: (1) was limited to lifting ten pounds, (2) could stand or walk for two hours, (3) could sit for six hours, (4) could occasionally climb stairs and ramps but not ropes or ladders, (5) could occasionally stoop, kneel, crouch and crawl, (6) could not reach overhead with the left hand, but could occasionally reach in front of her with the left hand, (7) could understand and follow simple instructions, (8) could perform simple tasks independently, (9) could maintain attention and concentration for two-hour periods, (10) could make simple and appropriate decisions, (11) could respond appropriately to co-workers and supervisors, and (12) could adjust to a routine work setting (Tr. 626-29). Cestar testified that such an individual could perform sedentary unskilled work as a surveillance system monitor, for which there were

4

approximately 1,200 jobs in the New York City area, and approximately 25,000 jobs nationally (Tr. 629). Cestar stated that his answer would be the same if the individual were also limited to only occasional downward reaching, and also if the individual had additional restrictions that included only limited contact with co-workers and only non-fast production, low-volume work (Tr. 629-30). He stated, however, that a claimant with the same exertional limitations who was also unable to maintain attention or concentration for two-hour periods because of pain would be unable to perform at a persistent pace and would not be able to perform any sedentary, unskilled jobs (Tr. 629).

**Evidence Prior To The Period At Issue**

In May 2007, Plaintiff was treated by Dr. Bhupinder Sawhney ("Dr. Sawhney"), an internist and sports medicine specialist (Tr. 167-72). On examination, Plaintiff had increased lumbar lordosis but no kyphoscoliosis; muscles of the cervical spine were symmetrical with mild to moderate tenderness, and there was some muscle spasm in her paraspinal muscles and upper trapezius (Tr. 169). Plaintiff also had diffuse tenderness in her left elbow and arm, as well as

5

tenderness in her left wrist (Tr. 170).  Her left shoulder was symmetrical with moderate pain on palpation (Tr. 169).  Spurling maneuver was positive, and Dr. Sawhney reported a positive impingement sign, supraspinatus test and drop arm test, as well as positive straight leg raise testing bilaterally (Tr. 169-70). Plaintiff reportedly had slow gait, but ambulated independently (Tr. 170).  Dr. Sawhney diagnosed cervical and lumbosacral strain/sprain, left shoulder contusion and sprain/strain, left elbow and arm contusion, and "ruled out" cervical and lumbar radiculitis due to disc displacement (Tr. 171).

X-rays of Plaintiff's left wrist in May 2007 revealed "[l]ow grade degenerative changes," but no fracture or dislocation (Tr. 154, 347, 427, 530).  X-rays of the cervical spine were "unremarkable," with well-maintained vertebral body height and disc spaces, normal bone density, and no fracture or subluxation (Tr. 155, 344, 426, 531).  Left elbow x-rays similarly revealed an "[i]ntact unremarkable" joint, with no fracture or dislocation (Tr. 156, 346, 425, 532).  Lumbosacral spine x-rays showed "mild concave right scoliosis" but no fracture or subluxation (Tr. 157, 345, 424, 533).  Vertebral body height and disc spaces were well maintained, and bone density was normal (Id.).

6

An MRI of Plaintiff's left shoulder in May 2007
revealed a low-lying acromion and findings consistent with
tendinosis of the distal supraspinatus tendon, but no definite
evidence of tear or retraction (Tr. 158, 343, 421).  Cervical
and lumbar spine MRI revealed marked straightening of the usual
lordosis and disc bulges at C4-C5 and C6-C7 (Tr. 159, 342, 423,
529).

Plaintiff also saw orthopedic surgeon Dr. Mitchell
Kaphan at Bronx Health Care Medical in May 2007 (Tr. 185-89,
276-77, 279-81, 339-41, 455-60, 468-72).  Dr. Kaphan assessed
limited range of motion in Plaintiff's cervical spine, with
flexion to forty degrees, extension to fifty degrees, and
lateral bending and rotation to thirty degrees bilaterally (Tr.
186).  The left shoulder had limited flexion and abduction to
100 degrees, and Plaintiff reported tenderness at the base of
the neck, as well as at the subdeltoid bursa and left
acromioclavicular (Tr. 186-87).  Deep tendon reflexes were
intact, and neurological examination was unremarkable (Tr. 188).
Dr. Kaphan diagnosed cervical sprain, contusion of the left
shoulder, and left acromioclavicular sprain (Tr. 188-90).

7

Plaintiff was seen for a physical therapy from May 2007 through November 2007 prior to the period at issue (Tr. 332-34, 505-17). On evaluation in May 2007, strength was within normal limits except in the left upper extremity, in which strength was decreased at 3/5 (Tr. 516). Cervical spine flexion was limited to ten degrees, with lateral flexion to fifteen degrees, and lateral rotation to five degrees; shoulder external rotation was limited to thirty degrees and internal rotation to fifteen degrees, but Plaintiff had shoulder flexion to 100 degrees and abduction to ninety degrees (Id.). Her balance was good and endurance was fair (Id.). Straight leg raise testing was negative (Id.).

In July 2007, Plaintiff was seen by rehabilitation specialist Dr. Dina Nelson at Bronx Health Care Medical (Tr. 173-77, 462-67). Dr. Nelson noted a positive left shoulder impingement sign with tenderness, limited internal rotation, and an unquantified decrease in strength (Tr. 173-74). The doctor reported moderate restriction in lateral rotation and flexion of her cervical spine, a positive Spurling sign on the left, and dysesthesia in the left C4-C5 dermatome (Id.). Electrodiagnostic testing reportedly revealed evidence of left-sided C6 radiculopathy (Tr. 173-75). The report also indicated

8

that Plaintiff had lumbar muscle spasm and marked limitations in flexion and extension (Tr. 173).  However, straight leg raise testing was negative (Id.).

When evaluated by Dr. Sawhney in September 2007, range of motion revealed normal cervical flexion, with cervical extension to an average of twenty degrees, left lateral flexion to thirty-nine degrees and right lateral flexion to sixteen degrees (Tr. 192).  Lumbar lateral flexion averaged fourteen degrees on the left and sixteen degrees on the right (Tr. 192). "Computerized muscle testing" indicated left lower and upper extremity weakness, with Plaintiff's maximum strength on left elbow flexion measured at twenty-one pounds, and wrist flexion and extension measured at nineteen and eighteen pounds, respectively (Tr. 198-203).

In October 2007, Dr. Sawhney reported that Plaintiff's neck pain was improving, but that Plaintiff still complained of pain in her shoulder and back (Tr. 335-37, 385-87, 444-46).  Dr. Sawhney reported mildly decreased range of motion and tenderness in the neck, as well as moderately decreased range of motion and mild tenderness in her back, but that reflexes and strength were within normal limits (Tr. 335).  Mild shoulder tenderness was

9

reported with mildly decreased range of motion, and negative Spurling sign (Tr. 335).

Plaintiff was evaluated at the Federation Employment and Guidance Service ("F.E.G.S.") in June and July 2007, in connection with an application for public assistance (Tr. 299-330). Dr. M. Shuja noted mildly to moderately limited range of motion in Plaintiffs left shoulder and back (Tr. 310-11). A social work assessment noted that Plaintiff was "calm, cooperative, polite and well-groomed," with appropriate mood and affect; however, she reported a past abusive relationship, but was not receiving mental health treatment (Tr. 315, 317).

In June 2007, Plaintiff was evaluated by psychiatrist Dr. Ophelia Villar ("Dr. Villar"), who reported that Plaintiff was well-groomed, calm, and cooperative upon examination, with well-articulated speech, logical thought processes and normal thought content and reality testing (Tr. 320). Plaintiff was oriented to person, place and time, with no impairment in reading, writing, or abstraction (Tr. 321). Although her mood was depressed and her affect constricted, she was not suicidal (Tr. 320). She registered three out of three objects, and could spell "world" backwards, but did not complete serial sevens or

10

remember objects after five minutes (Tr. 320-21).  Dr. Villar
diagnosed post-traumatic stress disorder and depressive disorder
(Tr. 321).  She also assessed moderate limitations in
Plaintiff's ability to follow work rules, accept supervision,
deal with the public, maintain attention, relate to co-workers,
and adapt to change or stressful situations (Id.).  Dr. Villar
assessed that Plaintiff had a temporary disability, and was
likely to return to full-time work in three months with
treatment (Tr. 322).

Plaintiff was seen by psychiatrist Dr. Karen Rosenbaum
("Dr. Rosenbaum"), who completed a public assistance
employability assessment on August 20, 2007 (Tr. 297-98, 392-94,
409-10).  The doctor diagnosed major depression and post-
traumatic stress disorder (Tr. 298).  Examination revealed no
psychomotor agitation or retardation, normal speech, and good
grooming and hygiene (Id.).  Plaintiff's mood was depressed and
anxious, with tearful affect and passive suicidal ideation, but
she had no suicidal plan or intent (Id.).  She reported
intrusive thoughts related to a past abusive relationship and
said she occasionally heard her boyfriend call her name, and had
last heard this one month earlier (Id.).  Dr. Rosenbaum checked
a box to indicate that Plaintiff would be unable to work for at

11

least twelve months, but also stated that improvement in mood
and anxiety could take "up to" twelve months and that Plaintiff
needed six to twelve months to stabilize on medication (Tr.
297).

**Evidence During The Period At Issue**

Plaintiff was treated at Bronx Health Care Medical
during the period November 2007 through July 2009 (Tr. 428-43,
492-504, 550-53), and received physical therapy from November
2007 to August 2008 (Tr. 492-504).  Physical therapy records
indicated that Plaintiff "tolerated [physical therapy] well,"
felt better with treatment, and responded well to treatment
(Id.).

Dr. Sawhney reported in December 2007 that Plaintiff
had "mild to moderate" paraspinal tenderness (Tr. 441).
Straight leg raise testing and foraminal compression tests were
negative, and reflexes and strength testing was acceptable
(Id.).  Plaintiff declined suggested trigger point injections
(Tr. 441-42).

12

In April 2008, Dr. Sawhney noted tenderness and decreased range of motion that was generally "mild," except for mild-to-moderate tenderness and moderately decreased range of motion in Plaintiff's back (Tr. 435).  Dr. Sawhney reported that Plaintiff had a positive left shoulder impingement sign, but supraspinatus, foraminal compression and straight leg raise testing were all negative (Id.). Reflexes and strength were also acceptable (Id.).

Dr. Ahmad Riaz ("Dr. Riaz") examined Plaintiff in June 2008, and noted that range of motion was mildly decreased in Plaintiff's neck and moderately decreased in her back (Tr. 432). Plaintiff reportedly had moderate paraspinal tenderness in both areas, but foraminal compression and straight leg raise tests remained negative (Id.).  Plaintiff's shoulder had mildly decreased range of motion and some tenderness as well, but impingement sign and suspraspinatus testing were negative (Id.). Dr. Riaz diagnosed cervical, lumbosacral, and left shoulder sprain/strain, and left shoulder contusion (Tr. 433).  According to Dr. Riaz, Plaintiff's condition remained unchanged in July 2008, except that her neck tenderness was described as only "mild," rather than "moderate" (Tr. 429-30).

13

On July 6, 2009, Dr. Riaz completed a form titled, "Physical Residual Functional Capacity Questionnaire," at the request of Plaintiff's attorney (Tr. 550-53).  He diagnosed cervical sprain, lumbar sprain, and left shoulder sprain, which was being treated with physical therapy and medication including Oxycontin (Tr. 550).  The doctor checked lines on the form to indicate that Plaintiff's reported symptoms interfered with Plaintiff's attention and concentration "constantly," that she experienced depression and anxiety that contributed to her functional limitations, and that she was "incapable of even low stress jobs" (Tr. 551).  Dr. Riaz opined that Plaintiff could walk only a block without rest; could sit or stand and walk for less than two hours in an eight-hour day; and needed to stand and walk every thirty minutes (Id.).  He also indicated that Plaintiff needed to elevate her legs with prolonged sitting, or for twenty-five percent of an eight-hour day, and that she needed a cane or other assistive device (Tr. 551-52).  He further opined that Plaintiff could lift less than ten pounds; only occasionally look down, look up, turn her head, or hold her head still; and could never climb ladders, climb stairs, twist, stoop, crouch or squat (Tr. 552).  Dr. Riaz assessed that Plaintiff did not have significant limitations in reaching, handling, or fingering, but also indicated that she could use

14

her left hand to grasp, turn or twist objects only fifty percent
of the time and could never reach with her left arm (Tr. 552).
He also checked a line to indicate that Plaintiff was likely to
be absent more than four days per month because of her
impairments (Tr. 553).

    Orthopedist Dr. Justin Fernando ("Dr. Fernando")
examined Plaintiff in January 2008 (Tr. 362-65).  Plaintiff
stated that she lived alone, and showered, bathed, and dressed
herself (Tr. 363).  Upon examination, she was five feet, five
inches tall, and 167 pounds, and was in no acute distress (Tr.
363).  Her gait was normal, she used no assistive devices, and
she was able to walk on heels and toes without difficulty (Id.).
She squatted less than twenty-five percent, but could change,
get on and off the examination table, and rise from a chair
without difficulty (Tr. 363).  Her hand and finger dexterity
were intact, and she had full (5/5) grip strength bilaterally,
as well as full range of motion in her shoulders, elbows,
forearms, wrists, fingers, hips, knees, and ankles bilaterally,
with no joint inflammation, effusion or instability (Tr. 363-
64).  Strength was full in both upper and lower extremities, and
reflexes were physiologic and equal, with no muscle atrophy or
sensory abnormality (Tr. 364).  She had full flexion of her

15

cervical spine, although extension was limited to approximately thirty degrees; lateral flexion was full on the right and thirty to thirty-five degrees on the left; and rotary movements were full bilaterally (Tr. 363).  She had no cervical or paracervical pain or spasm, and no trigger points (Id.).  Flexion in her thoracic and lumbar spine was limited at forty-five degrees, with nearly zero extension; however, she had full lateral flexion and full rotary movements bilaterally (Tr. 364).  Straight leg raise testing was positive at thirty degrees bilaterally, and in the upright position at ninety degrees (Id.).  Plaintiff also had tenderness over her lumbosacral spine, as well as paraspinal tenderness extending into the lumbar and thoracic spine, but no tenderness in the sciatic notches and no spasm, scoliosis, or kyphosis (Id.).

Dr. Fernando diagnosed chronic lower back pain, and pain in the cervical spine with radiation to the left lower extremity (Id.).  He opined that Plaintiff had some limitation in looking up and in squatting (Id.).  He also noted that, although Plaintiff was severely restricted in bending forward and backward, her physical examination showed no evidence of muscle wasting and tendon reflexes were intact and functioning (Id.).

16

Plaintiff was treated by orthopedist Dr. Mark McMahon ("Dr. McMahon") during the period January 2008 through July 2009 (Tr. 388, 395, 398-404, 461, 473, 519-28, 548, 554-59, 593-98). Dr. McMahon completed workers compensation forms during this period (Tr. 519, 521, 523, 525, 527, 594).  On examination on January 18, 2008, Plaintiff reportedly had tenderness in her back and left trapezius, as well as a positive Hawkins impingement sign (Tr. 388).  Plaintiff was able to raise her left arm to 150 degrees, with external rotation to seventy degrees (Id.).  Dr. McMahon diagnosed cervical and lumbar disc bulges, as well as left rotator cuff injury (Tr. 388).  In his January 2008 report, and again in subsequent workers compensation reports, Dr. McMahon requested authorization for shoulder surgery (Tr. 388, 519, 521, 523, 525, 527, 556, 594). In a January 27, 2008 statement, Dr. McMahon stated that Plaintiff was "unable to return to work until further notice" (Tr. 395).

On March 17, 2008, Dr. McMahon completed a medical source statement in which he stated that Plaintiff had cervical and lumbar disc bulges, and left rotator cuff injury (Tr. 398-404, 461, 524).  He opined that Plaintiff could lift up to ten

17

pounds occasionally, that she could not carry even this amount,
and that she could sit for one hour at a time for a total of two
hours in an eight hour work day (Tr. 398-99).  Dr. McMahon
further stated that Plaintiff did not need a cane, but could
only stand or walk for ten minutes at a time, for a total of one
hour standing and one hour walking in an eight hour work day
(Tr. 399).  He stated that she could never reach with either
hand, but could handle, finger, or feel continuously (Tr. 400-
01).  He further opined that Plaintiff could occasionally
balance or operate foot controls, could never climb stairs,
ramps, ladders or scaffolds, and could never stoop, kneel,
crouch, or crawl (Id.).

In addition, Dr. McMahon opined that Plaintiff could
not operate a motor vehicle, or be exposed to extreme cold or
vibrations (Tr. 402).  The doctor stated that Plaintiff could
tolerate:  (1) continuous exposure to unprotected heights and
moving mechanical parts, (2) frequent exposure to dust, odors,
fumes, and pulmonary irritants, (3) occasional exposure to
extreme heat, or to humidity and wetness, and (4) exposure to
moderate, office-level noise (Id.).  Dr. McMahon further
assessed that Plaintiff could not shop, travel unassisted, or
walk a block at a reasonable pace on rough or uneven surfaces

18

(Tr. 403).  The doctor also assessed that Plaintiff could use standard public transportation, climb a few steps at a reasonable pace using a handrail, prepare a simple meal and feed herself, care for her personal hygiene, and sort, handle, and use papers or files (Tr. 403).  Examination in December 2008 was similar, except with reported cervical pain, left shoulder elevation to 130 degrees and internal rotation to sixty-four degrees (Tr. 548).

Dr. McMahon also recommended, in his March and May 2008 reports, that Plaintiff have lumbar spine fusion/decompression surgery (Tr. 524, 528), but in later reports did not repeat that recommendation (Tr. 520-21, 548, 595).  Plaintiff testified at her July 2009 hearing that she never had shoulder or back surgery (Tr. 618-19).

Dr. McMahon also completed forms on July 8, 2009 (Tr. 554-59).  He diagnosed cervical and lumbar disc bulges and left shoulder rotator cufftendinopathy (Id.).  He stated that Plaintiff had pain in her left shoulder, as well as pain and stiffness in her cervical and lumbar spine with a sixty-seven percent loss of motion (Tr. 554).  He reported that Plaintiff's pain radiated through her left arm to both legs, and that her

19

legs "fe[lt] weak" with walking (Tr. 555). Treatment included physical therapy and Oxycodone (Tr. 555-56). Dr. McMahon opined that Plaintiff could stand or sit continuously for less than two hours each; could alternate sitting or standing for up to two hours at a time; and could walk one block without stopping (Tr. 556). He also stated that Plaintiff could lift up to ten pounds, but could carry no weight, and needed to lie down during the day "if her back pain act[ed] up" (Id.). The doctor also indicated that Plaintiff had "problems" bending, squatting, kneeling, or turning, in that these activities hurt Plaintiffs neck, back and left shoulder (Id.).

Dr. Karen Rosenbaum ("Dr. Rosenbaum") treated Plaintiff during the period February 2008 through June 2009, first at the Bronx Lebanon Hospital Center Department of Family Practice in February 2008 (Tr. 382-83, 397, 411) and then at the Martin Luther King Health Center from March 2008 through June 2009 (Tr. 406-08, 567-86). In a February 2008 note, Dr. Rosenbaum stated that Plaintiff was being treated for major depressive disorder, and was "unable to work at this time" (Tr. 397, 411). A March 24, 2008 form completed by Dr. Rosenbaum indicated that Plaintiff was depressed, had insomnia, poor concentration and memory, hopelessness and passive suicidal

20

ideation (Tr. 407).  Dr. Rosenbaum opined that Plaintiff had
moderate limitations in her ability to understand, remember, and
carry out both simple and complex instructions, and had moderate
limitations in her ability to make judgments on simple and
complex work-related decisions (Tr. 406-07).

Psychiatric treatment notes from March 2008 indicate
that Plaintiff had not taken medication for two weeks because of
a Medicaid problem (Tr. 583-84).  Upon examination, Plaintiff
was casually dressed; had fair grooming and hygiene; was
cooperative with appropriate eye contact; and had normal speech
and goal-directed thought processes despite depressed mood and
constricted affect (Id.).

When seen next in May 2008, Plaintiff reportedly had
missed a week of medication again because of a Medicaid problem
(Tr. 581-82).  Mental status examination remained unchanged (Tr.
582).  Treatment notes from July 2008 indicated that Plaintiff
had missed several appointments and again ran out of medication
with a corresponding increase in symptoms (Tr. 579).  Upon
examination, Plaintiff had good grooming and hygiene, was
cooperative, made eye contact, and had normal speech, goal-
directed thought processes, and appropriate affect (Id.).  She

21

reported recent but not current suicidal ideation and said her mood was "not good" (Id.).  In August 2008, it was reported that Plaintiff's affect was constricted, she reported occasional but not current suicidal ideation, and stated that she had "some" appetite and was sleeping "off and on" (Tr. 585-86).

Plaintiff missed her September 2008 appointment, but in October 2008 reported feeling better with additional medication (Tr. 577-78).  Mental status examination was unremarkable, and Dr. Rosenbaum noted that Plaintiff's depression was "improving" (Tr. 578).  Examination remained largely unchanged in November, but Plaintiff appeared anxious and reported that she was having trouble sleeping and had "a lot on her mind" as one of her sons had been incarcerated (Tr. 575). In February 2009, Plaintiff was upset over a cyst that needed to be biopsied (Tr. 573).  Mental status examination was otherwise unremarkable, and she stated that her mood was "okay" (Id.). Her condition was again described as "improving" in March 2009 (Tr. 571).

Plaintiff was reportedly "improving on med[ication]" in May 2009 (Tr. 569).  Mental status examination was unremarkable, and Plaintiff's mood was "okay" (Id.).  By June

22

2009, Plaintiff again stated that she was "feeling okay," with no reported problems (Tr. 567).

Psychologist Dr. Edward Hoffman ("Dr. Hoffman") examined Plaintiff on January 2, 2008 (Tr. 358-65).  Plaintiff reported that she chose her own clothes, showered independently, could make a sandwich for herself, could read and write, could make phone calls from home, and could also use a pay phone (Tr. 358, 360).  On examination, Plaintiff was cooperative, with an adequate manner of relating, social skills, and overall presentation (Tr. 359).  She was neatly groomed, maintained good eye contact, and spoke with adequate speech and flow (Id.). There was no evidence of delusions, hallucinations, or disordered thinking, and she was oriented in three spheres (Id.).  Her mood was anxious but stable, and she had a clear sensorium (Id.).  Her cognitive functioning appeared borderline, and responses to questions regarding arithmetic and general knowledge suggested below average attention and concentration (Id.).  Although she was able to recall three objects after one minute, she was only able to recall one object after five minutes (Id.).  Dr. Hoffman suggested that Plaintiff showed impaired social skills, based in part on her report of having

23

only one friend, but stated that she had relatively adequate
adaptive functioning overall (Tr. 360).

Dr. Hoffman diagnosed a major depressive episode and
borderline intellectual functioning (Id.).  He opined that
Plaintiff could understand and follow simple instructions and
directions; perform simply tasks independently; maintain
attention and concentration for rote tasks; learn new rote
tasks; make simple appropriate decisions; and relate to others
in structured and non-stressful situations (Id.).

State agency review psychologist Dr. Thomas Harding
("Dr. Harding") reviewed the medical evidence of record and
assessed Plaintiff's mental residual functional capacity on
January 11, 2008 (Tr. 372-80).  Dr. Harding opined that
Plaintiff did not have a condition that met the criteria for a
listed impairment (Tr. 372). With respect to Plaintiff's
residual functional capacity, Dr. Harding noted that Plaintiff
had eleven years of education and significant work history as a
cashier despite a reported history of special education (Tr.
379). Although the evidence showed that Plaintiff saw a
psychiatrist monthly for medication for depression, anxiety and
post traumatic stress disorder, Dr. Harding considered that

24

Plaintiff had no history of psychiatric hospitalization and was

not in therapy (Tr. 379-80).  He also noted that Plaintiff had

reported no problem with people in authority and had at least

one friend, performed most activities of daily living, read, and

watched television (Tr. 380).  Dr. Harding also noted that

Plaintiff appeared to function in the borderline range of

intelligence and alleged limitations in memory and socialization

as well as symptoms of anxiety (Id.).

     In addition, Dr. Harding considered the report by

F.E.G.S. suggesting moderate limitations, but noted that it was

based on a single contact (Id.).  He also noted Dr. Rosenbaum's

August 2007 statement that Plaintiff would need six to twelve

months to be stabilized on medication, but stated that clinical

findings did not fully support that opinion (Id.).  Dr. Harding

also considered Dr. Hoffman's statement, following a mental

status examination, that Plaintiff was capable of performing

routine work-like tasks (Id.).  Dr. Harding concluded that

Plaintiff was able to understand, execute and remember simple

instructions and work-like procedures; maintain attention and

concentration; sustain a normal workday and work week; maintain

a consistent pace; relate appropriately to supervisors and

coworkers; adapt to changes in a routine work setting; and use judgment to make simple work-related decisions (Id.).

**Standard of Review**

The Social Security Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Richardson v. Perales, 402 U.S. 389, 390 (1971); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). Thus, if a court finds that there is substantial evidence supporting the Commissioner's determination, the Commissioner's decision must be upheld, even if there is also substantial evidence for the Plaintiff's position. Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990); Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982); see DeChirico v. Callahan, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (Commissioner's decision affirmed where substantial evidence for both sides).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S.

26

197, 229 (1938)); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004).  The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from such facts.  See Murphy v. Sec'y of Health & Human Serv., 62 F. Supp. 2d 1104, 1106 (S.D.N.Y. 1999); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977). The rule that the Commissioner's findings of fact, as well as the inferences and conclusions to be drawn from those findings, are conclusive applies even in those instances where a reviewing court's independent analysis of the evidence may differ from the Commissioner's analysis.  Rutherford v. Schweiker, 685 F.2d 60, 62-63 (2d Cir. 1982), cert. denied, 459 U.S. 1212 (1983).  In short, the reviewing court is not to decide the case.  Halloran, 362 F.3d at 31; Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).

In order to establish disability under the Act, a claimant has the burden of establishing:  (1) that she was unable to engage in substantial gainful activity by reason of a physical or mental impairment that could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment was demonstrated by evidence supported by data obtained by medically acceptable

27

clinical and laboratory techniques.  42 U.S.C. § 423(d)(l)(A);

Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  More

particularly, the Act provides:

> An individual shall be determined to be under a
> disability only if [her] physical or mental impairment
> or impairments are of such severity that [she] is not
> only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy ....

42 U.S.C. § 423(d)(2)(A).

For a person to be found disabled within the meaning

of the Act, it is not sufficient that she establish the mere

presence of a disease or impairment.  The claimant bears the

burden of persuasion to show that the disease or impairment has

caused functional limitations that preclude her from engaging in

any substantial gainful activity and thus that she is entitled

to benefits.  Mongeur v, Heckler, 722 F.2d 1033, 1037 (2d Cir.

1983); Carroll v. Sec'y of Health & Human Serv., 705 F.2d 638,

642 (2d Cir. 1983).


**Substantial Evidence Supports the Commissioner's Findings**

28

The Commissioner's regulations prescribe a five-step procedure for evaluating disability claims.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> Step one asks if the claimant is currently
> engaged in "substantial gainful activity."  Step
> two asks if the claimant's impairment is
> "severe."  Step three asks if the impairment
> appears in the "Listing of Impairments," 20
> C.F.R. Part 404, Subpart P, App. 1.  Step four
> asks if the claimant can still do "past relevant
> work."  Step five asks if the claimant "can make
> an adjustment to other work," with reference to
> the "Medical Vocational Guidelines" ("the
> Grids"), 20 C.F.R. Part 404, Subpart P, App. 2,
> Tables 1-3.

Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. 641, 643 (2d Cir. 2007).  If the claimant shows that her impairment renders her unable to perform her past work, the burden shifts to the Commissioner to show there is other gainful work in the national economy which the claimant could perform.  Balsamo, 142 F.3d at 80; Carroll, 705 F.2d at 642.

The ALJ evaluated Plaintiff's claim pursuant to these five steps and found that, although Plaintiff had cervicalgia, cervical disc bulges with straightening of lordosis, left shoulder tenonitis, mild lumbar scoliosis and disc bulges, a

29

major depressive disorder, post-traumatic stress disorder, and
borderline intellectual functioning, the impairments did not
meet or equal the requirements of any listed impairment, 20
C.F.R. § 404, Subpart P, Appendix 1 (Tr. 12-13). Next, the ALJ
determined that Plaintiff had the residual functional capacity
to perform sedentary work that did not require overhead
reaching, more than occasional reaching in front and down with
her non-dominant left hand, climbing ropes or ladders, more than
occasional climbing of ramps and stairs, more than occasional
stooping, kneeling, crouching or crawling, and was restricted to
jobs that required no more than remembering and carrying out
simple instructions and directions, performing simple tasks
independently, maintaining attention and concentration for rote
tasks, making simple appropriate decisions, relating
appropriately to co-workers and supervisors, and adjusting to a
routine work setting (Tr. 14). At the fourth step of the
sequential evaluation, the ALJ found that Plaintiff was unable
to do her past work as a cashier or hair stylist (Tr. 16). See
20 C.F.R. § 416.920(e). Proceeding to the fifth step of the
sequential evaluation, the ALJ considered Plaintiff's vocational
factors, and her residual functional capacity, along with the
testimony of a vocational expert, and concluded that there were
a significant number of jobs in the national economy that

30

Plaintiff could perform.  Accordingly, the ALJ found that
Daniels was not disabled (Tr. 16-17).  See 20 C.P.R. § 416.920.

     The opinion of consultative examiner Dr. Fernando
supports the ALJ's decision.  On examination, Dr. Fernando found
that Plaintiff had a normal gait, intact hand and finger
dexterity, full grip strength, full strength and range of motion
in both upper and lower extremities, normal reflexes, and no
atrophy, sensory abnormality, or spasm (Tr. 363-64).  Dr.
Fernando opined that Plaintiff had limitations only with respect
to looking up, squatting, and bending, and these restrictions
were incorporated into the ALJ's assessment of Plaintiff's
residual functional capacity, which restricted Plaintiff to
sedentary work, with no more than occasional stooping, kneeling,
crouching, and crawling (Tr. 14, 364).  See also Social Security
Ruling (SSR) 96-9p, 1996 WL 374185, at *7 (July 2, 1996) (noting
that these activities are not usually required for sedentary
work).  The report of a consultative examiner, such as Dr.
Fernando, may constitute substantial evidence to support an
ALJ's decision.  Mongeur, 722 F.2d at 1039.

     The ALJ's determination regarding Plaintiff's physical
residual functional capacity was also supported by clinical

31

assessments reflected in treatment notes during the period at issue. In December 2007, at the beginning of the period at issue, Plaintiff's reflexes and strength were reported to be within normal limits, and foraminal compression, supraspinatus, shoulder impingement and straight leg raise testing were all negative (Tr. 441). In addition, Plaintiff had only a mildly decreased range of motion of the neck and shoulder, and "mild" tenderness, with at most "moderate" decreased range of motion in her back (Id.). While impingement and straight leg raise tests were occasionally positive thereafter, indicating that Plaintiff reported increased subjective symptoms in certain positions, pain upon examination was reported to be only "mild" or "moderate" (Tr. 429, 432, 435). See Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983) (holding that "disability requires more than mere inability to work without pain").

Daniels first challenges the ALJ's assessment of her residual functional capacity as insufficient because the ALJ did not make a "function-by-function" assessment of her ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch. See Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated May 23, 2011 ("Pl. Br.") at 16. The ALJ found that Daniels retained the residual

functional capacity to perform sedentary work, which is defined
by the Commissioner's regulations as a job that primarily
requires sitting, with a certain amount of walking and standing,
and requires the ability to lift no more than ten pounds at a
time, and occasionally lift or carry articles like docket files,
ledgers, and small tools. 20 C.F.R. 416.967(a); see Social
Security Ruling (SSR) 83-10, 1983 WL 31251, at *5 (1983)
(sedentary work requires standing or walking no more than about
two hours in an eight-hour day). The ALJ also found that
Daniels was restricted from overhead reaching, climbing ropes or
ladders (Tr. 14). In addition, the ALJ specifically found that
Daniels could perform certain activities only occasionally:
reaching to the front and down on the left side, climbing ramps,
and stairs, stooping, kneeling, crouching, and crawling (Tr.
14).

        To support her contention, Daniels has cited several
unreported district court decisions for the proposition that the
ALJ must specifically analyze the claimant's ability to do each
function. Pl. Br. at 16-17. As at least two of the decisions
note, the Second Circuit does not require a function-by-function
analysis, and the Third and Sixth Circuits have specifically
ruled that such an analysis is not required. Dillingham v.

Astrue, No. 09-236, 2010 WL 3909630, at *11 (N.D.N.Y. Aug. 24, 2010), accepted, 2010 WL 3893906 (N.D.N.Y. Sept. 30, 2010); Diaz v. Astrue, No. 09-6243(HB), 2010 WL 3257779, at *9 (S.D.N.Y. Aug. 17, 2010).  Moreover, most courts in this district have declined to impose such a requirement.  Novak v. Astrue, No. 07-8435(SAS), 2008 WL 2882638, at *3 (S.D.N.Y. July 25, 2008) (ALJ not required to perform function-by-function analysis or have narrative discussion of each function); Casino-Ortiz v. Astrue, No. 06-0155(DAB)(JCF), 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) (sustaining ALJ decision notwithstanding failure to provide function-by-function analysis), adopted, 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008); Diaz, 2010 WL 3257779, at *8-9 (declining to resolve issue of whether ALJ must perform function-by-function assessment); see also Burrows v. Barnhart, No. 03-342, 2007 WL 708627, at *13 (D. Conn. Feb. 20, 2007) (ALJ not required to do function-by-function analysis).

Daniels cites to Banks v. Astrue, No. 06-1428(KMK)(GAY), 2009 WL 2482140, at *7 (S.D.N.Y. Aug. 13, 2009), in which the court criticized the ALJ's decision as failing to explain the basis for his residual functional capacity assessment.  The court found that the ALJ's decision provided "no basis upon which to determine whether the ALJ's finding that

34

Plaintiff had the RFC for light work is supported by substantial evidence". Id.  The case, however, contrasts with the decision at issue in this case because, here, the ALJ considered the Plaintiff's symptoms and the medical evidence of record in specifically assessing the Plaintiff's residual functional capacity (Tr. 14-16).

The ALJ found that Plaintiff had the mental residual functional capacity to perform simple tasks independently, maintain attention and concentration for rote tasks, make simple appropriate decisions, relate appropriately to co-workers and supervisors, and adjust to a routine work setting (Tr. 14). Moreover, the ALJ relied on substantial evidence, including the opinions of Dr. Hoffman and Dr. Harding, to support his decision.

After examining Plaintiff, Dr. Hoffman reported that the Plaintiff was cooperative, had an adequate manner of relating, and had adequate social skills and overall presentation (Tr. 359).  In addition, Plaintiff was neatly groomed, maintained good eye contact, and spoke with adequate speech and flow (Id.).  There was no evidence of delusions, hallucinations, or disordered thinking, and she was oriented in

35

three spheres (Id.).  Plaintiff also had a clear sensorium
(Id.).  Dr. Hoffman concluded that Plaintiff was able to
understand and follow simple instructions and directions,
perform simple tasks independently, learn and maintain attention
and concentration for rote tasks, make simple appropriate
decisions, and relate to other people in structured and non-
stressful situations (Tr. 360).  Dr. Hoffman's opinion was
consistent with the ALJ's restricted residual functional
capacity, and provided substantial evidence to support the ALJ's
decision.  See Mongeur, 722 F.2d at 1039 (consultative physician
report may provide substantial evidence to support ALJ
decision).

     After a review of the record, non-examining review
physician Dr. Harding also concluded that Plaintiff could
understand, execute and remember simple instructions and work-
like procedures, maintain attention and concentration, sustain a
normal workday and work week, maintain a consistent pace, relate
appropriately to supervisors and coworkers, adapt to changes in
a routine work setting, and use judgment to make simple work-
related decisions (Tr. 379-80).  Like Dr. Hoffman, Dr. Harding's
opinion was also consistent with the ALJ's findings regarding
Plaintiff's restricted mental residual functional capacity (Tr.

36

14).  State agency psychologists, such as Dr. Harding, are "highly qualified ... psychologists ... who are also experts in Social Security disability evaluation," 20 C.F.R. § 416.927(e)(2)(i), and their opinions are entitled to considerable weight.  Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).

The ALJ specifically considered the opinions of Drs. Sawhney, Kaphan, McMahon, Riaz, and Rosenbaum concerning Plaintiffs functioning and ability to work, but rejected those opinions (Tr. 15-16).  While Dr. Rosenbaum checked a box to indicate that Plaintiff would be unable to work for at least twelve months (Tr. 297), and Dr. McMahon stated that Plaintiff was "unable to return to work until further notice" (Tr. 395), and Dr. Sawhney indicated that Plaintiff had a "total" disability (Tr. 435-43), and Dr. Riaz indicated that Plaintiff's disability status was "total" (Tr. 431), the final responsibility for determining disability is "reserved to the Commissioner," and opinions that a claimant is disabled are not binding on the Commissioner.  20 C.F.R. § 416.927(d)(l) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled").

37

The ALJ also rejected the opinions of Drs. Sawhney,
Kaplan, McMahon, Riaz, and Rosenbaum in light of other
conflicting evidence that the ALJ found to be more persuasive.
While Drs. McMahon and Riaz opined that Plaintiff had a
restricted physical residual functional capacity (Tr. 399, 551),
the ALJ rejected those opinions in favor of the opinion of Dr.
Fernando, who opined that Plaintiff had limitations only with
respect to looking up, squatting, and bending (Tr. 364). Dr.
Fernando also reported that physical examination showed no
evidence of muscle wasting, and all tendon reflexes were intact
and functional (Id.). Plaintiff had a normal gait and station,
could walk on heels and toes, rise from a chair, get on and off
the exam table, and change clothes for the exam, all without
difficulty (Tr. 363). The doctor also found no muscle spasm on
examination (Tr. 363-64). Where other substantial evidence
conflicted with the opinions of Drs. McMahon and Riaz, an ALJ is
not required to accept their opinions. 20 C.F.R.
§ 416.927(d)(2) (treating source opinion entitled to controlling
weight only where well-supported by medically acceptable
clinical and laboratory diagnostic techniques and not
inconsistent with other substantial evidence of record);
Halloran, 362 F.3d at 32 (2d Cir. 2004) (treating source opinion

38

may be discounted where it conflicts with other evidence of record).  In addition, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.946(c) (assessment of residual functional capacity is responsibility of ALJ, who is trier of fact).

        In addition, the opinions of Drs. McMahon and Riaz were inconsistent with each other.  While Dr. McMahon assessed that Plaintiff could not tolerate noise, extremes of temperature, humidity, or wetness (Tr. 402), Dr. Riaz placed no such restriction on Plaintiff (Tr. 553).  The record did not contain any evidence to support the limitations imposed by Dr. McMahon.  In addition, Dr. McMahon's opinion that Plaintiff could never reach with her right hand directly conflicted with Dr. Riaz's July 2009 statement that Plaintiff had no such limitation (Compare Tr. 400 with Tr. 552).  Furthermore, Dr. Riaz's assessment that Plaintiff could grasp, turn, or twist objects only fifty percent of the time conflicted with Dr. McMahon's statement that Plaintiff could handle, finger, or feel "continuously" with her left hand.  Id.

39

With respect to Plaintiff's psychiatric condition, Dr. Rosenbaum's restricted functional assessment, upon which Plaintiff relies, was not binding on the Commissioner. The doctor's opinion was unsupported by the evidence in the record, and conflicted with the opinions of Drs. Hoffman and Harding. See Halloran, 362 F.3d at 32 (2d Cir. 2004) (treating source opinion not binding where not supported by evidence and where substantial evidence conflicts with it). While Dr. Rosenbaum assessed "moderate" limitations in a number of areas, she did so on a day when Plaintiff had been off medication for two weeks (Tr. 583-84). Despite being off medication, the results of the examination were largely unremarkable, with the doctor reporting appropriate eye contact, normal speech, and goal-directed thought processes (Id.). The record also showed that Plaintiffs depression improved once she began taking Wellbutrin, and in June 2009 she felt "okay," with no reported problems (Tr. 567, 569, 577-79).

Moreover, as discussed above, the opinions of Drs. Harding and Hoffman conflicted with the opinion of Dr. Rosenbaum, and the ALJ properly relied on those opinions. The ALJ could properly rely on the opinion of a consultative physician that conflicted with a treating physician's opinion.

40

Mongeur, 722 F.2d at 1039; Halloran, 362 F.3d at 32.   In addition, the ALJ could properly rely on the opinion of a state agency review psychologist, such as Dr. Harding, in rejecting Dr. Rosenbaum's opinion. See 20 C.F.R. § 416.927(e) (state agency medical consultants highly qualified and expert in evaluation of disability claims under the Act); Shalala, 59 F.3d at 313 n.5 (2d Cir. 1995) (opinion of non-examining source may override treating source opinions, provided it is supported by evidence of record); Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993) (same).

        Seeking to overturn the ALJ's reliance on evidence other than that produced by Plaintiff, she relies on five unreported decisions, including four unreported Second Circuit summary orders, and an unreported decision from another district.  See Pl. Br. at 20-22.  The Second Circuit rulings by summary order "do not have precedential effect."  2d Cir. Rule 32.1.1(a).  The decisions relied upon by Plaintiff also do not establish that the ALJ erred here.  The Plaintiff cites to Brickhouse v. Astrue, 331 Fed. Appx. 875 (2d Cir. 2009) (summary order), in which the court ruled that the ALJ erred in affording the opinion of a "non-physician consultant" greater weight than the opinion of a treating physician.  Id. at 877.  Here, in

41

contrast, the ALJ properly relied on opinions by examining physicians Dr. Hoffman and Dr. Fernando, and state agency review psychologist Dr. Harding.  Plaintiff also relies on Anderson v. Astrue, No. 07-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009), which concerned an ALJ decision which "failed to mention" two treating physician opinions as well as a report by a treating social worker.  Here, the ALJ properly considered all opinions of record, even if he did not accord them the weight Plaintiff urges.

        The other decisions relied upon by Plaintiff are not controlling.  See Petrie v. Astrue, 412 Fed. Appx. 401, 406-07 (2d Cir. 2011) (summary order) (affirming the Commissioner's decision and declining to give treating physician opinion controlling weight); Tarsia v. Astrue, No. 10-613, 2011 WL 1313699, at *2 (2d Cir. 2011) (summary order) (finding error where it was not clear what evidence review physician had reviewed, and review physician's opinion was apparently only evidence conflicting with treating physician opinion); Giddings v. Astrue, 333 Fed. Appx. 649, 654-55 (2d Cir. 2009) (summary order) (holding that the ALJ's assessment was not supported by substantial evidence and inconsistent with the treating source's opinion).

**Substantial Evidence Supports The ALJ's Finding That Plaintiff's
Complaints Were Not Credible To The Extent Alleged**

In assessing Plaintiff's residual functional capacity,
the ALJ also evaluated the credibility of Plaintiff's statements
regarding her symptoms (Tr. 14-16).  Under the statute, an
individual's statement as to pain or other symptoms is not,
alone, conclusive evidence of disability.  42 U.S.C.
§ 423(d)(5)(A); 20 C.F.R. § 416.929(b); accord Gallagher v.
Schweiker, 697 F.2d 82, 84 (2d Cir. 1983).  When a medically
determinable impairment exists, as here, objective medical
evidence must be considered in determining whether disability
exists, whenever such evidence is available.  20 C.F.R.
§ 416.929(c)(2).  If the claimant's symptoms suggest a greater
restriction of function than can be demonstrated by objective
evidence alone, consideration is also given to such factors as:
(1) the claimant's daily activities, (2) the location, duration,
frequency, and intensity of pain or other symptoms, (3)
precipitating and aggravating factors, (4) the type, dosage,
effectiveness, and adverse side-effects of medication that the
claimant has taken to alleviate her symptoms, (5) treatment
other than medication that the claimant receives or has received
for relief of pain or other symptoms, and (6) any other measures

43

that the claimant uses or has used to relieve her pain or other symptoms. 20 C.F.R. § 416.929(c)(3). It is well within the discretion of the Commissioner to evaluate the credibility of Plaintiffs testimony and render an independent judgment in light of the medical findings and other evidence regarding the true extent of the symptoms alleged. Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984). Indeed, the ALJ's determination should be afforded deference because he heard Plaintiff's testimony and observed her demeanor. Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999). In this case, although the ALJ did not find Plaintiff's condition disabling to the extent she alleged, he did not discount her allegations entirely; instead, the ALJ assessed significant limitations, and found Plaintiff capable of less than a full range of sedentary work (Tr. 14-16). While Plaintiff argues that the ALJ's determination was flawed because he did not explicitly consider the treatments other than medication that were recommended for Plaintiff's shoulder and back, Pl. Br. at 23-24, an ALJ need not "reconcile explicitly every conflicting shred" of medical evidence. Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983)); see Mongeur, 722 F.2d at 1040 (where "evidence of record permits us to glean the rationale of

44

an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him a conclusion of disability.").

Here, the ALJ considered various factors in assessing Plaintiff's credibility.  He acknowledged Plaintiffs allegations of disabling neck, back, and shoulder pain, as well medication side effects, but found that the allegations were not supported by Plaintiff's treatment records, or the opinion of Dr. Fernando, and were not corroborated by her daily activities, which included personal care, preparation of her own food, and some household chores (Tr. 15).  The ALJ also, among other factors, considered that Plaintiff did not appear to have difficulty in sitting at the administrative hearing (Tr. 15). See Schaal, 134 F.3d at 502 (ALJ may consider claimant's physical demeanor in weighing credibility).

Moreover, while Plaintiff criticizes the ALJ for not specifically mentioning that Dr. McMahon had requested approval for left shoulder arthoscopy surgery and spinal fusion/decompression surgery.  Pl. Br. at 23-24.  The record shows that Dr. McMahon requested approval for spinal surgery

45

only in March and May 2008, and never repeated that request in
his subsequent reports.  (Compare Tr. 523-24, 527-27 with Tr.
520-21, 548, 595).  As the ALJ noted, diagnostic testing
revealed no disc herniation or impingement that would warrant
spinal surgery (Tr. 16).  While Dr. McMahon also requested
approval for shoulder surgery from March 2008 through March 2009
(Tr. 520-21, 523-24, 527-28, 548, 595), Plaintiff testified at
the July 2009 hearing that she never had shoulder surgery or
back surgery, and was not planning on having it (Tr. 618-19).


        Because the ALJ heard Plaintiff's testimony at the
administrative hearing and observed her demeanor, the ALJ's
credibility determination concerning Plaintiffs symptoms is
entitled to deference.  Aponte v. Sec'y, Dep't of Health & Human
Servs., 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of
the [Commissioner], not the reviewing courts, to resolve
evidentiary conflicts and to appraise the credibility of
witnesses, including the claimant") (internal brackets omitted)
(quoting Carroll, 705 F.2d at 642); see Snell, 177 F.3d at 135
(ALJ has discretion to evaluate credibility of claimant and
arrive at independent judgment in light of medical findings and
other evidence).

46

**Substantial Evidence Supports the Finding That There Were A
Significant Number Of Jobs In The National Economy That
Plaintiff Could Perform**

At step five of the sequential analysis, the ALJ

considered Plaintiffs age, education, work experience and

residual functional capacity to determine whether Plaintiff

could perform jobs that existed in significant numbers in the

national economy (Tr. 16-17).  The ALJ asked Cestar, a

vocational expert, a series of hypothetical questions concerning

an individual who was the same age, and had the same education,

work experience, and residual functional capacity as Plaintiff

(Tr. 626-30).  Cestar testified that such a person could perform

the job of surveillance system monitor, for which there were

1,236 jobs in the New York City area and 25,000 jobs nationally

(Tr. 626, 629-30).  Relying on this testimony, the ALJ properly

found that there were a significant number of jobs in the

national economy that Plaintiff could perform.  See 20 C.F.R.

§ 416.966(e) (ALJ may rely on vocational expert to determine

whether there is work that exists in significant numbers in the

national economy that Plaintiff could perform given her

vocational factors and residual functional capacity); Dumas, 712

F.2d at 1554 (vocational expert's opinion, properly based on

Plaintiff's skills and limitations, satisfies Commissioner's

47

burden of showing existence of other work that Plaintiff can perform).

## The ALJ Was Not Required to Order a Consultative Intelligence Evaluation

Plaintiff contends that the ALJ was required to order intelligence testing of Plaintiff.  Pl. Br. at 14-16.  However, under Commissioner's regulations, an ALJ has discretion in deciding whether to order a consultative examination at Government expense.  20 C.F.R. § 416.917 ("we may ask you to have one or more physical or mental examinations or tests").

Here, the Commissioner ordered two evaluations of Plaintiff, by an orthopedist (Tr. 362-65), and a psychologist (Tr. 358-65), and the ALJ collected a total of 456 pages of medical evidence (Tr. 126-347, 358-413, 418-598).  Moreover, none of Plaintiff's treating physicians diagnosed or treated her for a cognitive impairment, and none of her treatment records suggested a need for additional testing (Tr. 381-413, 418-598). She had a work history as a parking lot cashier, a store cashier, and a hairstylist (Tr. 71-73, 617, 626).  Given these facts, the ALJ did not err in not ordering an intelligence test for Plaintiff.

48

## Conclusion

After evaluating the evidence of record, the Commissioner determined that Daniels failed to sustain her burden of proving that she was under a disability within the meaning of the Social Security Act.  This decision is reasonable and supported by substantial evidence, and is therefore affirmed.

It is so ordered.

New York, NY
April  17, 2012

_____
ROBERT W. SWEET

49